1

2

3

4                        UNITED STATES DISTRICT COURT

5                     NORTHERN DISTRICT OF CALIFORNIA

6

7    TULSEE NATHU, et al.,                    Case No.  20-cv-05242-JSC

8                    Plaintiffs,
                                              **ORDER ON MOTION FOR SUMMARY**
9          v.                                 **JUDGMENT**

10   CITY OF OAKLAND,                         Re: Dkt. Nos. 67, 73

11                   Defendant.

12

13          Tulsee Nathu, Daxa "Mina" Patel, Jayanti Nathu, II Ram 6801 I-40 West, Amarillo, TX,

14   Ltd., and 1000 RAM Inc., (collectively, "Plaintiffs") brought this lawsuit against the City of

15   Oakland ("Defendant") after the Oakland City Council denied Plaintiffs' request to build a hotel

16   on the Mandela Parkway in Oakland, California.  Plaintiffs seek a writ of mandate reversing

17   Defendant's decision, declaratory relief, and monetary damages.  Defendant's motion for

18   summary judgment is now pending before the Court.  Having carefully considered the parties'

19   briefing and having had the benefit of oral argument on October 13, 2022, the Court DENIES

20   Plaintiffs' petition for a writ of mandate under California Code of Civil Procedure § 1094.5 and

21   GRANTS Defendant's motion for summary judgment on Plaintiffs' remaining claims.

22                                    **BACKGROUND**

23   **I.      Factual Background**

24          Mina Patel and Jayanti Nathu first worked at a hotel in Oakland in 1986.  (Dkt. No. 69-1 at

25   10.)[1]  After one year, they moved to Texas where their family business builds, owns, and operates

26   hotels.  (*Id.* at 11.)  Tulsee Nathu assists with the family business.  In 2015, Plaintiffs hoped to

27   _____

28   [1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the
     ECF-generated page numbers at the top of the documents.

1   return to Oakland to build a hotel after many years away.  (Dkt. No. 69-1 at 13–14.)

2       Plaintiffs discovered a parcel on the Mandela Parkway in Oakland.  (Dkt. No. 74-3 at 7.)

3   Based on the location, Plaintiffs believed they could build a successful hotel ("the Mandela

4   Hotel") on the parcel.  (*Id.* at 6.)  The property sits in a triangular space between a series of

5   highways and interchanges.  (Dkt No. 68-3 at 64.)  The California Department of Transportation

6   owned the property and planned to sell the land at auction.  (Dkt. No. 69-1 at 39.)   At the auction,

7   Plaintiffs won an option to purchase the property for $3,010,000.  (*Id.* at 40.)

8       Around the time Plaintiffs purchased the option, Plaintiffs learned that Unite Here, Local

9   2850—a labor union that represents hotel, foodservice, and gaming workers—was interested in

10  the Mandela Hotel project.  (*Id.* at 19–20.)  Mina Patel met with Unite Here, Local 2850's

11  representative, Ty Hudson, and discussed a "project neutrality agreement," whereby Plaintiffs

12  would not oppose employees' unionization efforts.  (*Id.*)  Patel informed Hudson that she "can do

13  better for [her] employees" and refused to sign such an agreement.  (*Id.*)

14      Plaintiffs then hired architect Jim Heilbronner to manage the design, planning, and

15  permitting process in 2016. (Dkt. No. 69-1 at 111.)  Heilbronnner had designed one other hotel in

16  Oakland—the Hampton Inn Downtown—which is also non-union operated.  (Dkt. No. 74-2 at 12.)

17  As part of the planning process, Heilbronner met with members of the City Council to obtain

18  support for the project.  (Dkt. No. 69-1 at 113.)  According to Heilbronner, multiple city council

19  members asked Heilbronner about the project's "approach with the unions" and encouraged

20  Plaintiffs to make a deal with unions.  (*Id.* at 107;112.)  Tulsee Nathu also met with City Council

21  members.  (Dkt. No. 74-3 at 12.) She recalls a City Council member "emphasized that [a card-

22  check neutrality agreement] would be a decision factor on whether or not they could push the

23  project to approve" and asked "have you spoken to 2850?" (*Id.*)  According to Nathu, one City

24  Council member sent her a draft "card check agreement" following a meeting.  (*Id.* at 14.)

25      **A.       The Planning Commission**

26      Plaintiffs designed a six-story hotel with 220 rooms.  (Dkt. No. 68-2 at 683.)  The

27  proposed Mandela Hotel would measure approximately 142,813 square feet in floor area with a

28  two-level underground parking garage and a surface parking lot with 166 spaces. (*Id.*)  Because

United States District Court
Northern District of California

1    Plaintiffs' plan for the Mandela Hotel exceeded 25,000 square feet, the Oakland Planning Code

2    required that Plaintiffs obtain a permit from the Oakland Planning Commission (the "Planning

3    Commission"). (Dkt. No. 68-3 at 190.)  Planning Commission decisions are appealable to the

4    Oakland City Council.  (*Id.* at 181.)

### 1.    The Permit Application

6          The parcel is zoned as a "CR-1, Regional Commercial Zone." (*See* Dkt. No. 68-2 at 683.)

7    The Oakland Planning Code ("Planning Code") sets out the necessary requirements to build in a

8    CR-1 zone.  Relevant here, the Planning Code requires a 20-foot "setback" on CR-1 parcels facing

9    a right-of-way of 100 feet or more.  Planning Code § 17.37.03.  Another document, the West

10   Oakland Specific Plan ("West Oakland Plan"), encourages new construction—such as the

11   Mandela Hotel—to maintain the continuity of the areas' "street walls" by building to the edge of

12   the sidewalk. (DKt. No. 76-1 at 68.)  But the West Oakland Plan provides "guidelines" that do not

13   supersede the Planning Code and projects that vary from the Planning Code to conform with the

14   West Oakland Plan must receive City approval.  (*Id.* at 65.)  The Planning Code also requires that

15   a permit proposal for a hotel "consider[] the impact of the employees of the hotel or motel on the

16   demand in the City for housing, public transit, and social services."  Planning Code

17   § 17.103.050(A)(2).

18         Plaintiffs filed their initial permit application in November 2016. (Dkt. No. 68-3 at 1320.)

19   The initial design met the 20-foot setback requirement.  (Dkt. No. 68-3 at 401.)  Heilbronner then

20   presented the design to the Planning Commission's Design Review Committee, which provided

21   feedback on Plaintiffs' design.  (*Id.* at 427.)

22         Plaintiffs then resubmitted the permit application in November 2017.  (Dkt. No. 68-3 at

23   1250.)  The revised application requested a minor variance from the 20-foot setback requirement.

24   (Dkt. No. 68-3 at 182.)  Specifically, Plaintiffs now hoped to place a stairway directly adjacent to

25   the sidewalk and needed variance approval to do so.  (*Id.*)  Plaintiffs anticipated the hotel would

26   employ 44 staff members.  (*Id.* at 1285.)  As to the impact of employees on the demand for

27   housing, transit, and social services, the application states: "The majority of the hotel employees

28   will be local residents and will most likely utilize public transit to commute to work.  The

United States District Court
Northern District of California

3

1 employees will receive wages and benefits commiserate [sic] with other hotels in Oakland." (Dkt.

2 No. 68-3 at 1298.)  Plaintiffs also provided a California Environmental Quality Act ("CEQA")

3 analysis at that time.  (Dkt. No. 68-3 at 467.)

### 2.  The Planning Staff Report and Unite Here's Objections

5 In advance of Planning Commission review, the Planning Commission's staff (the

6 "Planning Staff") prepared a Staff Report evaluating Plaintiffs' Application. (Dkt. No. 68-3 at

7 182.)  Planning Staff recommended that the Planning Commission grant Plaintiffs' permit

8 application.  (*Id.* at 193.)  With regard to the impact on social services, housing, and public transit,

9 Planning Staff wrote:

> The hotel proposal will provide new employment and help to diversify the economic base of the City by creating approximately 44 permanent jobs. There are housing alternatives as new market rate and affordable residential development have been approved and others are being constructed in the City of Oakland for future residents. The project is located close to existing public transit with AC Transit bus lines running along 40th Street and San Pablo Avenue that will provide services to hotel employees. The proposal would not create social services impacts because the new jobs can provide economic opportunities to Oakland residents and help reduce unemployment rate. To help promote jobs and the hiring of local residents, staff recommends a condition of approval.

17 (*Id.* at 196.)  As for the setback, Planning Staff found that strict compliance with the 20-foot

18 requirement would "constrain" the building's operations. (*Id.* at 198.)  Planning Staff also stated

19 that the West Oakland Plan includes an objective of "having buildings directly abut the sidewalk"

20 and that a minor variance would not constitute a special privilege in this case.  (*Id.*)

21 Unite Here opposed Plaintiffs' application.[2]  Unite Here's opposition letter provided three

22 specific complaints.  (*Id.*)  First, Unite Here argued Plaintiffs' CEQA environmental analysis was

23 insufficient.  (*Id.*)  Second, Unite Here believed that the setback variance for the stairway failed to

24 meet the variance requirements.  (*Id.*)  And third, Unite Here argued that the application

25 insufficiently analyzed the project's impact on demand for housing, public transit, and social

26 services in the city.  (*Id.*)

27 

---

28 [2] While this letter is dated January 5, 2017 (Dkt. No. 68-2 at 807) – a subsequent letter makes it clear that the letter was in fact sent on January 5, 2018.  (Dkt. No. 68-2 at 701.)

1    With regard to the variance, Unite Here argued that Plaintiffs' application failed to meet

2 four conditions necessary to obtain a variance. (*Id.* at 808.)  Specifically, Unite Here argued that

3 because the initial design complied with the 20-foot requirement, strict compliance with the

4 regulation did not preclude an effective design solution. (*Id.*)  Unite Here also argued that a

5 nearby hotel in the same zone complied with the setback requirement and that the stairwell would

6 interrupt pedestrian flow in "the otherwise open, connecting corridor between West Oakland and

7 Emeryville." (*Id.*)

8    As to the project's impact under Planning Code § 17.103.050(A)(2), Unite Here argued

9 Plaintiffs' application and Planning Staff failed to properly consider the project's effects on

10 housing and social service needs in Oakland. (*Id.* at 810.)  Because the application did not commit

11 to any specific wage level or benefits provision, Unite Here argued that the Mandela Hotel was

12 likely to increase the demand for affordable housing. (*Id.*)

13    Unite Here also provided an economic analysis linking low-wage hotel positions with an

14 increased demand for social services. (*Id.* at 784-806.)  Depending on the number of employees

15 actually hired, Unite Here estimated that the project would cost Oakland between $2.3 million and

16 $7.3 million in housing subsidies. (*Id.* at 789.)  According to those estimates, those employees

17 would also require $32,000 to $109,000 in annual costs to Medi-Cal, $21,000 to $74,000 in public

18 assistance per year, and $22,500 to $75,600 in uninsured costs to local hospitals. (*Id.* at 789–790.)

19    **3.    Planning Commission Review**

20    The entire Planning Commission first considered Plaintiffs' application in January 2018.

21 (Dkt. No. 68-3 at 272.)  At that meeting, Heilbronner delivered a presentation. He projected the

22 hotel would provide employment for 57 total employees—27 full-time and 30 part-time. (Dkt No.

23 68-3 at 278-9.)  He stated that the goal was 50 percent or more of those employees would be

24 Oakland residents. (*Id.*)  Regarding wages, he stated "Wages and benefits, we are talking about

25 living wage standard, not minimum wage standard, pertaining to the City's living wage

26 ordinance." (*Id.*)  He also noted that Plaintiffs planned to provide a commuter stipend for

27 employees using mass transportation as well as job-training services. (*Id.*)

28    As to the setback variance, Heilbronner had concerns that the West Oakland Plan

encouraged buildings abutting the sidewalk, but the Planning Code requires a 20-foot setback

from the sidewalk.  (*Id.* at 278.)  He stated that Plaintiffs "deliberately pulled the stair tower

forward" into the setback area after conversations with Planning Staff about the West Oakland

Specific Plan.  (*Id.* at 283.)  But he noted the plan with the 20-foot setback was "doable." (*Id.* at

278.)

After comments from community members supporting and opposing the project, the

Planning Commission questioned Tulsee Nathu and Heilbronner.  (*Id.* at 314.)  Commissioners

expressed some misgivings regarding Plaintiffs' efforts at community engagement and encouraged

Plaintiffs to codify their promises regarding pay rates and community benefits in a community

benefit agreement.  (*See id.* at 319.)  But Planning Staff noted that Oakland had "limited legal

ability to require [] a labor agreement or union labor on the project as a condition of approval"

where the City was not the landowner.  (*Id.*)  At least two other non-union hotels have been

constructed in Oakland in recent years. (Dkt. Nos. 69-1 at 24; 74-2 at 12.)

After further discussion, the Planning Commission postponed its decision on the permit

application so Plaintiffs could have the opportunity to conduct further community outreach. (*Id.* at

362-363.)  The commissioners also encouraged Plaintiff to work with Planning Staff to address

potential options for moving the stairwell because Plaintiffs "could do it without a variance."  (*Id.*)

Plaintiffs' application came before the Planning Commission again on June 18, 2018.

(Dkt. No. 68-2 at 946).  Little had changed in the design between the January and June meetings.

(*Id.* at 961.)  As to the stair tower, Heilbronner explained that he kept the design abutting the

sidewalk because he "felt pretty strongly about, frankly leaving it where it is because we had a

design earlier that had it in the back, which met strictly with the Zoning Code but not the Specific

Plan."  (*Id.* at 962.)  The Planning Commission also considered Unite Here's CEQA arguments

and the Planning Staff's recommendation that Plaintiffs' CEQA filings were sufficient.  (*Id.* at

1048.)

By a four to two vote, the Planning Commission approved Plaintiffs' application and

variance request, subject to a condition that the Mandela Hotel would pay at least $15 per hour to

its employees and hire locally.  (*Id.* at 1048–1049.)

C.    **The City Council Appeal**

Unite Here appealed the decision to the City Council.  The appeal specifically challenged Plaintiffs' application as to (1) the lack of analysis regarding the project's impact on social services, transportation, and housing under OPC § 17.103.050(A)(2), (2) the setback variance issue, and (3) Plaintiffs' CEQA analysis. (Dkt No. 68-2 at 393–397.)

### 1.    **November 2019 Hearing**

After scheduling delays, the City Council heard testimony regarding the Unite Here appeal in November 2019.  (Dkt. No. 68-1 at 530.)  Planning Staff recommended denying the appeal and affirming the Planning Commission's decision on all counts. (*Id.* at 535; Dkt. 68-2 at 373.)  Ty Hudson then presented on behalf of Unite Here.  (Dkt. No. 68-1 at 536.)  Hudson focused his argument on the OPC § 17.103.050(A)(2) issue and contended that the Planning Department failed to consider the impact of the project on Oaklands social services and housing market.  (*Id.* at 538, 434.)  Heilbronner then presented in favor of the project.  (*Id.* at 544.)  Heilbronner reported that union carpenters would be constructing the hotel and that "the other commitment the developer is willing to make is 50 percent plus local hire for permanent hotel employees." (*Id.*)  These commitments were on a slide in Heilbronner's presentation and in a handout. (*Id.* at 449, 554.)[3]  Plaintiffs also discussed funding a public shuttle in West Oakland.  (*Id.* at 449.)  After lengthy public comment, the Council directed Plaintiffs to meet with Planning Staff to clarify the potential impacts of the Mandela Hotel's employees and discuss compliance with Measure Z—a 2018 measure a $15.00 hotel worker minimum age and the requires installation of panic buttons for housekeeping staff.  (*Id.* at 84, 605.)

### 2.    **Supplemental Evidence**

Planning Staff requested additional information regarding the project's impact from Plaintiffs.  (*Id.* at 430.)  Through counsel, Plaintiffs responded that "the City Council may very well be exceeding its legal authority by asking the applicant for a Card Check Neutrality Agreement and a Community Benefits Agreement as conditions of approval."  (*Id.* at 431.)  After

---

[3] Plaintiffs moved to supplement the administrative record to include a draft, unexecuted community benefits document. (*See infra*, Section I.A; Dkt. No. 73.)

suggesting litigation may be necessary, Plaintiffs reiterated promises to hire locally, donate $10,000 to a local transit, and work with local schools.  (*Id.*)  Finally, Plaintiffs stated:

> [W]e do not see any material impact of hotel employees on the demand in the City for housing, public transit and social services. 50% of the hotel employees will be local people and therefore will use the same amount of housing and public transit as they previously used. Their demand and the demand of their families will be greatly lessened because they will have good steady long term employment. The non-local employees will be parking at the hotel and will not be living in the neighborhood and will also be using less social services for the same reason that the local employees will use less social services.

(*Id.*)  After receiving this letter, Planning Staff then prepared a supplemental report to the City Council.  (*Id.* at 420.)  Planning Staff again recommended denying Unite Here's appeal, emphasizing that (1) the project would pay $15.00 per hour to all employees, (2) Oakland was developing more housing units, (3) the project was located near rapid transit options, and (4) reducing unemployment would make employees less dependent on social services.  (*Id.*)

Unite Here submitted a further opposition letter challenging these conclusions.  (*Id.* at 426.)  Specifically, Unite Here challenged Planning Staff's assumption that new housing development would be affordable for Mandela Hotel Staff because just seven percent of new units were income restricted and $15 per hour is insufficient to afford a market rate unit.  (*Id.*)

### 3.    The February 2020 Hearing

The City Council revisited the Unite Here appeal in February 2020.  Planning Staff again recommended denying the appeal based on the analysis in its supplemental report.  (*Id.* at 347.) Ty Hudson spoke in favor of Unite Here's appeal, again emphasizing that low-wage jobs would increase demand for affordable housing and arguing the Planning Staff's analysis on the issue was insufficient.  (*Id.* at 350.)  Plaintiffs responded that "the 44 people that are going to work at this hotel, 50 percent of them are going to be from Oakland. They already live here. The other people are not coming from Tabuk, Iowa or something. They either live in Oakland or in one of the surrounding towns."  (*Id.* at 352.)  Plaintiffs encouraged the Council to "stand up to the hotel workers union" and approve a hotel that would add development to the area, create good jobs, and provide the city with tax revenue.  (*Id.* at 354.)

8

After public comments, the City Council began their debate.  (*Id.* at 385.)  Councilmember McElhaney stated her position that "after careful consideration of the record," she "[did] not find that the Patels have structured this deal in such a way that it really addresses the spirit and the intent of our Planning Code Section 17.103.050" and that "sometimes the Planning Commission gets it wrong."  (*Id.* at 386–7.)  She added that "the variance to allow a one foot setback instead of the normally required 20-foot setback constitutes a special privilege, unavailable to comparable property owners."  (*Id.* at 394.)  While the West Oakland Plan Guidelines call for a "street wall" along the Mandela Parkway, she felt Plaintiffs' design was insufficient in service of that goal because only a small corner of the building would abut the street.  (*Id.*)  She requested that Planning Staff prepare a resolution upholding Unite Here's Appeal and denying the permit based on both Planning Code § 17.103.050 and the variance issue.  (*Id.*)

All but one councilmember supported Councilmember McElhaney's motion. Councilmember Gallo seconded the motion.  (*Id.* at 388.)  Councilmember Kalb stated that while the area was "desperate" for hotel development, there was not "a win/win solution" and "logical things have been said on all sides." (*Id.* at 389.)  Councilmember Bas supported the motion and was "moved to say" that "Oakland has to do better. . . Oakland must have much higher standards than we do. We truly should be a union town, where we build union and we operate union."  (*Id.* at 390.) Councilmember Thao supported the motion, stating, "I think it's one thing to say that you'll do X, Y, Z but it's another thing to actually have it written down and it's a real thing. And I also believe that we can, as a city, as a whole city, build union and employ with union." (*Id.* at 391.)  Vice Mayor Reid opposed the motion and encouraged Plaintiffs to explore a lawsuit against the City of Oakland.  (*Id.* at 392.)

### 4.   The June 2020 Hearing

The City Council heard final testimony on June 16, 2020.  (Dkt. No. 68-1 at 80.) Plaintiffs' counsel David Mullin again presented in favor of the project.  (*Id.* at 45.)  Addressing the potential burden to Oakland, Mullin estimated the project would bring a maximum of 21 new residents to Oakland.  (*Id.* at 47.)  Mullin then divided the 2020 Oakland City Budget ($1.6 billion) by Oakland's rough population (425,000) to reach a value of $3,764 in expenditure per

9

resident.  Mullin then multiplied $3,764 by 21 to reach a burden to Oakland of $79,044 per year. (*Id.* at 47, 86.)  He also addressed the variance issue.  (*Id.* at 96.)  Mullin argued that Plaintiffs had submitted designs complying with the setback, (*see id.* at 51, 52.), but the Design Review Commission had encouraged Plaintiffs to bring part of the hotel to the property line.  (*Id.* at 96.) He stated, "We did that. We'll do it either way. We'll do it either way you want.  The setback is really just a red herring in this." (*Id.*)  Mullin also stated that Plaintiffs would install panic buttons to comply with Measure Z, that Plaintiffs' promises to pay $15 per hour and hire locally were binding, and that the City could enforce Plaintiffs' assurances.  (*Id.*)

After further public comment and opposition from Unite Here, the City Council formally adopted Resolution 88171 with seven votes in favor and one absence.  (*Id.* at 131.)   Resolution 88171 states:

> RESOLVED: That the City Council finds and determines that the Planning Commission erred in making required findings specifically for: (1) a Minor Variance for front setback reduction and (2) Planning Code Section 17.103.05(A)(2) which requires consideration of the impact of the hotel employees on the demand in the City for housing, transit, and social services, and be it
>
> FURTHER RESOLVED: That the City Council also finds and determines that the variance to allow a one-foot setback instead of the normally required 20-foot setback constitutes a special privilege unavailable to comparable property owners. Staff indicates support for this variance by citing to the West Oakland Specific Plan Design Guidelines, which does call for setbacks to create a street wall along Mandela Parkway. However, this setback is not in the service of creating a street wall, but rather only for a small corner of the building; and be it
>
> FURTHER RESOLVED: That the City Council also finds and determines that the project did not "meet with the spirit and intent of Planning Code Section 17.103.050" in that: (1) the applicant has not provided any evidence or provided any way for the City to guarantee that 50 percent of the workers would be hired from Oakland, and (2) there is a concern about adequate wages being paid to hotel workers, and (3) the applicant has not provided evidence of a willingness to comply with Measure Z to protect hotel workers susceptible to sexual assault and other safety concerns. In sum, the Planning Commission erred in not fully considering the impact concerning this land use because of the reasons stated above.

(*Id.* at 135.)  Plaintiffs filed suit against the City of Oakland on July 30, 2020.  Plaintiffs request a writ of mandate directing the permit be granted, declaratory relief, and $48,000,000 in damages.

**DISCUSSION**

Plaintiffs ask the Court to reverse the City Council's decision through a writ of mandate under CCP § 1094.5, sue for damages under the Equal Protection Clause and Takings Clause of the United States Constitution, and request declaratory relief.   Defendant opposes the writ of mandate and moves for summary judgment on each claim.

**I.      Writ of Mandate**

A writ of mandate under California Code of Civil Procedure ("CCP") § 1094.5 seeks judicial review of local agency decisions.  CCP § 1094.5(a).  The parties dispute the scope of the administrative record, whether the City Council abused its discretion, and whether Plaintiffs received a "fair trial." The Court addresses each issue in turn.

**A.      Plaintiffs' Motion to Supplement the Administrative Record**

Defendant shared the administrative record with Plaintiffs in November 2021.  (*See* Dkt. Nos. 68-1, 68-2, 68-3.)  In July 2022, Plaintiffs filed a motion to supplement the administrative record to include (1) Heilbronner's presentations from the January and June 2018 Planning Commission meetings; (2) signed MOUs with the Oakland Unified School District and the Oakland Private Industry Council regarding job training; and (3) a draft community benefits agreement between Oakland and Plaintiffs.  (Dkt. No. 73.)

CCP § 1094.5 states that "all or part of the record of the proceedings before the inferior tribunal, corporation, board, or officer may be filed with the petition, may be filed with respondent's points and authorities, or may be ordered to be filed by the court."  Defendant argues that because these items were not before the City Council, Plaintiffs' additional evidence should be excluded.  (Dkt. No. 77 at 4 citing *Eureka Citizens for Responsible Gov't v. City of Eureka*, 147 Cal. App. 4th 357, 366 (2007), *as modified* (Feb. 1, 2007) (affirming denial of motion to supplement record in CEQA context because documents were "neither presented to, nor considered by, the city council in its deliberations or decision."))

The Court disagrees.  Each item Plaintiffs seek to include was before the Council to some extent and presents evidence that is largely cumulative to the rest of the record.  As to the benefits agreement, Heilbronner references a "community benefits document" at the November 16, 2021,

11

City Council meeting.  (Dkt. No. 68-1 at 544.)  Councilmember Kaplan explicitly acknowledges the "handout." (*Id.*) Heilbronner then discusses a commitment to 50 percent plus local hiring for permanent hotel employees on that handout. (*Id.*)  The unexecuted benefits agreement in Plaintiffs' submission reflects these same promises and states it will be effective "October 1, 2019." (Dkt. No. 73 at 65.)  Plaintiffs also provided an email to Councilmember McElhaney in March with attachments that included the executed MOUs with the Private Industry Council and Oakland School District, and the "092019 CBA.pdf." (*Id.* at 18.)  As to Heilbronner's presentations, those slides were also available to the Council.  Heilbronner presented to the Planning Commission.  The Planning Commission meetings were recorded, and those video links were given to the City Council in the Planning Staff's report. (Dkt. No. 68-2 at 374.)  Thus, there is some evidence that the Planning Commission meeting presentations were available to the City Council.  (*Id.*)

In sum, Plaintiffs' motion to supplement the administrative record to include the presentations, the MOUs, and the draft, unexecuted community benefits agreement is GRANTED.

### B.    Abuse of Discretion

Plaintiffs argue for a writ of mandate under CCP § 1094.5 on grounds that the City Council abused its discretion under the Planning Code when the Council upheld Unite Here's appeal and denied Plaintiffs' permit to build the Mandela Hotel.  Under CCP § 1094.5, the "substantial evidence test" applies to abuse of discretion claims where no fundamental vested right is involved. *Benetatos v. City of Los Angeles*, 235 Cal. App. 4th 1270, 1280 (2015).  "Cases involving abuse of discretion charges in the area of land use regulation do not involve fundamental vested rights." *Topanga Assn. for a Scenic Cmty. v. Cnty. of Los Angeles*, 214 Cal. App. 3d 1348, 1356 n.4 (1989).  Thus, because Plaintiff challenges abuse of discretion in land use regulation, the Court applies the substantial evidence test.  *See Topanga Assn.*, 214 Cal. App. 3d at 1356 n.4.[4]

 "When an appellant challenges an administrative decision as unsupported by substantial evidence in light of the record as a whole, it is appellant's burden to demonstrate that the

---

[4] The parties agree that the substantial evidence test applies to the abuse of discretion claim.  (Dkt. No. 67 at 21; Dkt. No. 74 at 16.)

administrative record does not contain sufficient evidence to support the agency's decision." *International Brotherhood of Electrical Workers v. Aubry,* 42 Cal.App.4th 861, 870 (1996). The Court "must resolve all conflicts in the evidence in favor of the judgment or decision of the tribunal below and indulge in all legitimate and reasonable inferences to support it." *Greenebaum v. City of Los Angeles,* 153 Cal.App.3d 391 (1984). The inquiry is objective. "Only if no reasonable person could reach the conclusion reached by the administrative agency, based on the entire record before it, will a court conclude that the agency's findings are not supported by substantial evidence." *Do v. Regents of Univ. of California*, 216 Cal. App. 4th 1474, 1490 (2013). The Court must uphold the City's decision if any one of the City Council's findings is supported by substantial evidence. *Kutzke v. City of San Diego*, 11 Cal. App. 5th 1034, 1041 (2017) (collecting cases).

The City Council found that the Planning Commission erred in granting a one-foot setback variance. (Dkt. No. 68-1 at 135.) Substantial evidence supports the City Council's decision. Thus, Plaintiffs' petition for a writ of mandate reversing the City Council is denied.[5]

### 1.    The Variance

The Mandela Hotel project did not meet the Planning Code's 20-foot setback requirement for CR-1 Zones. (Dkt. No. 68-3 at 187.) Specifically, one portion of the hotel—a stair tower— was only set back one foot from the sidewalk. (*Id.*) Plaintiffs requested a minor variance to accommodate this design. (*Id.*) Under Planning Code 17.148.050, a variance may only be granted if all of the following conditions are present:

> 1.    That strict compliance with the specified regulation would result in practical difficulty or unnecessary hardship inconsistent with the purposes of the zoning regulations, due to unique physical or topographic circumstances or conditions of design; or, as an alternative in the case of a minor variance, that such strict compliance would preclude an effective design solution improving livability, operational efficiency, or appearance.
>
> 2.    That strict compliance with the regulations would deprive the

---

[5] The City Council also found that the project did not "meet with the spirit and intent of Planning Code Section 17.103.050." (*Id.*). The Court need not address this finding because the variance finding is supported by substantial evidence. *Kutzke*, 11 Cal. App. 5th at 1041.

13

United States District Court
Northern District of California

1
applicant of privileges enjoyed by owners of similarly zoned
2
property; or, as an alternative in the case of a minor variance, that
such strict compliance would preclude an effective design solution
fulfilling the basic intent of the applicable regulation.

3
3.      That the variance, if granted, will not adversely affect the
4
character, livability, or appropriate development of abutting
properties or the surrounding area, and will not be detrimental to the
public welfare or contrary to adopted plans or development policy.

5
6
4.      That the variance will not constitute a grant of special
privilege inconsistent with limitations imposed on similarly zoned
properties or inconsistent with the purposes of the zoning regulations.

7
8
5.      That the elements of the proposal requiring the variance (e.g.,
elements such as buildings, walls, fences, driveways, garages and
9
carports, etc.) conform with the regular design review criteria set forth
in the design review procedure at Section 17.136.050.

10
6.      That the proposal conforms in all significant respects with the
Oakland General Plan and with any other applicable guidelines or
11
criteria, district plan, or development control map which have been
adopted by the Planning Commission or City Council.

12

13
Planning Code 17.148.050.  Planning Staff analyzed each requirement under 17.148.050.  (Dkt.

14
No. 68-3 at 198–199.)  The fourth and sixth requirements are relevant to this appeal.  As to the

15
fourth requirement, Planning Staff determined that "[t]he granting of the variance for the front

16
yard setback reduction for a portion of the building will not constitute a grant of special privilege

17
since the project will function practically for its required purpose, provide a design solution for a

18
constrained and underutilized site and will limit impacts on neighboring commercial properties."

19
(*Id.* at 199.) As to consistency with zoning objectives, Planning Staff support the variance as

20
"consistent with the West Oakland Specific Plan," which calls for buildings that directly abut the

21
sidewalk.  (*Id.* at 198.)  The Planning Commission agreed.

22
But the City Council found the Planning Commission erred.  (Dkt. No. 68-1 at 135.)

23
Substantial evidence supports that finding.

24
a.      **Special Privilege**

25
Resolution 88171 states that the City Council "finds and determines that the variance to

26
allow a one-foot setback instead of the normally required 20-foot setback constitutes a special

27
privilege unavailable to comparable property owners."  (*Id.*) Evidence in the record supports this

28
finding.  As Unite Here pointed out in its appeal letters, neighboring properties—namely, an

Extended Stay Hotel—abide by the setback requirement.  (Dkt. No. 68-2 at 396, 809.)  Thus, a reasonable person could reach the conclusion reached by the administrative agency, based on the entire record before it.  *Do*, 216 Cal. App. 4th at 1490.

### b.     West Oakland Specific Plan

The Council also determined that the design could not be excused due to the West Oakland Plan.  The West Oakland Plan states that "new construction should be built to the edge of sidewalks to maintain the continuity of the area's street walls. Small ground-level inset bays for entrances, outdoor seating, and special corner features are appropriate variations within the street wall.  In addition, an occasional plaza may be also appropriate."  (Dkt. No. 68-3 at 65.)  The Council found Plaintiffs' design fell short of these aims.  Specifically, the Council resolved that "[Planning] Staff indicates support for this variance by citing to the West Oakland Specific Plan Design Guidelines, which does call for setbacks to create a street wall along Mandela Parkway. However, this setback is not in the service of creating a street wall, but rather only for a small corner of the building." (Dkt. No. 68-1 at 135.)   Plaintiffs' design drawing supports this finding:



United States District Court
Northern District of California

1   (*Id.* at 51.)  As the design drawing shows, only a small corner of the building (the lower right

2   corner of the gray portion) abuts the sidewalk near the Mandela Parkway.  (*Id.*)  This evidence

3   supports the City Council's finding that the building both violates the 20-foot setback requirement

4   *and* fails to create a "street wall" as discussed in the West Oakland Plan.

5        Plaintiffs argue that (1) it is impossible to satisfy both the West Oakland Plan and the

6   Planning Code's setback mandates and (2) the Planning Commission encouraged the design that

7   the City Council later rejected.  But these arguments do not support reversal of the City Council's

8   decision.  As to the inconsistency between the West Oakland Plan and the Planning Code,

9   Plaintiffs' argument fails because the West Oakland Plan provides "guidelines" that do not

10  supersede the Planning Code, (Dkt. No. 76-1 at 65), and the City Council found that the design

11  met *neither* the West Oakland Plan nor the Planning Code's requirements, (Dkt. No. 68-1 at 135).

12  As to the Planning Commission's inducement to design only a one-foot setback, Plaintiffs'

13  argument fails because Plaintiffs challenge the very nature of appellate review.  In other words, to

14  the extent the Planning Commission encouraged the "in-setback" design, the City Council found

15  the Planning Commission erred.  While that is understandably frustrating for Plaintiffs, Plaintiffs

16  cite no case holding the City Council is estopped from overturning a Planning Commission

17  decision merely because the Planning Commission encouraged the design.[6]

18                                                *** 

19        In sum, "it is *not* the role of the courts to micro-manage these development decisions. Our

20  function is simply to decide whether the city officials considered the applicable policies and the

21  extent to which the proposed project conforms with those policies, whether the city officials made

22  appropriate findings on this issue, and whether those findings are supported by substantial

23  evidence." *Kutzke*, 11 Cal. App. 5th at 1042 (cleaned up).  As discussed above, substantial

24  evidence supports the City Council's decision to reverse the Planning Commission on the variance

25  issue.  The Court must uphold the City's decision if any one of the City's findings is supported by

26

27  ─────────────────────

    [6] Plaintiffs' willingness to use an alternative 20-foot setback design is not material to this inquiry.

28  (Dkt. No. 74 at 17.) This Court reviews only the City Council's denial of the variance request, not
    alternative proposals that Plaintiffs could have chosen to pursue.

1    substantial evidence.  *Id.* at 1041.  Because a reasonable person could reach the conclusion

2    reached by the administrative agency based on the entire record before it, the City Council did not

3    abuse its discretion in reversing the variance decision.  *Do*, 216 Cal. App. 4th at 1490.

4        **C.    Fair Trial**

5        CCP § 1094.5(b) also allows a petitioner to challenge whether he or she received a fair trial

6    before the administrative agency. To prevail on a claim of bias violating fair hearing requirements,

7    a petitioner must establish "an unacceptable probability of actual bias on the part of those who

8    have actual decision making power over their claims."  *Breakzone Billiards v. City of Torrance*,

9    81 Cal. App. 4th 1205, 1236 (2000) (quoting *United States v. State of Or.*, 44 F.3d 758, 772 (9th

10   Cir. 1994)).  A mere suggestion of bias is not sufficient to overcome the presumption of integrity

11   and honesty.  *Id.*  Rather, a party seeking to show bias or prejudice on the part of an administrative

12   decision maker to prove the same with concrete facts.  *Id.* at 1237.  A challenge to the procedural

13   fairness of the administrative hearing is reviewed de novo on appeal because the ultimate

14   determination of procedural fairness amounts to a question of law.  *Nasha v. City of Los Angeles*,

15   125 Cal. App. 4th 470, 482 (2004).

16       Plaintiffs raised this "fair trial" theory for the first time at oral argument.  At the October

17   13, 2022 hearing, Plaintiffs' counsel argued CCP § 1094.5(b) required reversal of the City

18   Council's decision because there was no fair trial before the administrative agency.  (Oral

19   Argument Recording at 6:20.)  The Court inquired as to "what case" supports Plaintiffs' position.

20   (*Id.* at 7:20.)  Plaintiffs' counsel described, a "California case" where an administrative

21   decisionmaker's pre-judgment bias required the court to issue a writ of mandate reversing the

22   administrative decision under CCP § 1094.5(b).  (*Id.* at 7:34.)  The Court asked Plaintiffs' counsel

23   to "look at [his] brief and tell [the Court] what case that is." (*Id.* at 7:50.)  Plaintiffs' counsel

24   responded that he would provide the Court with that case promptly after the hearing.  (*Id.*)  After

25   the hearing, Plaintiffs filed supplementary briefing with two citations to cases that interpret the

26   "fair trial" requirement under CCP § 1094.5(b).  (Dkt. No. 84 at 1.)  Neither case was cited in

27   Plaintiffs' brief.  (Dkt. No. 74.)  Defendant objected to Plaintiffs' invocation of a new legal theory

28   at this stage. (Dkt. No. 85.)  Plaintiffs responded that the scope of review under CCP § 1094.5(b)

United States District Court
Northern District of California

17

1   includes whether Plaintiffs received a fair trial, that Plaintiffs made the "fair trial" arguments in

2   their opposition, and that "the Court inquired whether there were cases that supported Plaintiffs'

3   position." (Dkt. No. 86 at 1–2.)

4          But Plaintiffs' opposition brief did not make any argument regarding the "fair trial"

5   analysis under CCP § 1094.5(b). Indeed, the words "fair trial" appear only once, amidst a

6   quotation from CCP § 1094.5. (Dkt. No. 74 at 16.) After agreeing the abuse of discretion

7   substantial evidence test applies in this case (rather than the de novo analysis for bias claims),

8   Plaintiffs' brief reads as follows:

9

10         The standards are favorable to the Plaintiffs:

11         (b) The inquiry in such a case shall extend to questions whether the
           respondent proceeded without, or in excess of jurisdiction; whether
           there was a fair trial; and whether there was any prejudicial abuse of
12         discretion. Abuse of discretion is established if the respondent has not
           proceeded in the manner required by law, the order or decision is not
13         supported by the findings, or the findings are not supported by the
           evidence.
14
           (c) Where it is claimed that the findings are not supported by the
15         evidence, in cases in which the court is authorized by law to exercise
           its independent judgment on the evidence, abuse of discretion is
16         established if the court determines that the findings are not supported
           by the weight of the evidence. In all other cases, abuse of discretion
17         is established if the court determines that the findings are not
           supported by substantial evidence in the light of the whole record.
18         CAL. CODE CIV. PRO. § 1094.5(b), (c).

19         *Here, there was a clear abuse of discretion.*

20   (*Id.*) (emphasis added).

21         Thus, while an inquiry under this statute can extend to whether there was a fair trial,

22   Plaintiffs' own briefing disputed only whether the City Council abused its discretion under CCP §

23   1094.5. (*Id.* at 17- 22.) Plaintiffs' papers never used the term "bias," cited no cases regarding

24   CCP § 1094.5(b)'s fair trial provision,[7] and cited the standard of review for the "abuse of

25   discretion" prong under CCP § 1094.5 rather than the de novo standard for the "fair trial"

26

27   _____

28   [7] While Plaintiff did provide citations after oral argument, the Court had asked Plaintiffs only to
     explain where "in [Plaintiffs'] brief" those cases were cited. The Court did not invite Plaintiffs to
     provide additional briefing with new arguments after the hearing.

United States District Court
Northern District of California

provision.  Thus, the briefing failed to put Defendant on notice that Plaintiffs contested the Council's alleged bias under CCP § 1094.5(b).  At most, Plaintiffs call the City Council's decision an "absurdity" for lack of substantial evidence, and claim this absurdity is evidence the decision was "pretextual."  (Dkt. No. 74 at 19.)  But that argument is merely a disagreement with the merits of the City Council's decision, not a showing of actual bias with concrete facts.  *Breakzone Billiards*, 81 Cal. App. 4th at 1237.  As Plaintiffs failed to raise the bias issue in their briefs, the Court declines to consider Plaintiffs' new theory at this late stage.

### D.      Conclusion

Because a reasonable person could reach the City Council's decision regarding the variance based on the administrative record submitted, the Court DENIES Plaintiffs' request for a writ of administrative mandate under CCP § 1094.5.

## II.      Constitutional Claims

Defendant also moves for summary judgment on Plaintiffs' remaining constitutional claims.  As discussed below, Defendant's motion for summary judgment is GRANTED as to each claim.

### A.      Equal Protection

Plaintiffs brings two separate Fourteenth Amendment Equal Protection Clause challenges: (1) a "class-of-one" challenge; and (2) a *Monell* claim.  Both fail as a matter of law.

#### 1.      Class of One

To plead a "class-of-one" equal protection claim, Plaintiffs must allege facts showing that they have been (1) intentionally (2) treated differently from others similarly situated and that (3) there is no rational basis for difference in treatment.  *SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1122–23 (9th Cir. 2022).  "A class-of-one plaintiff must be similarly situated to the proposed comparator in all material respects."  *Id.*  This standard requires "showing that [] comparators are similarly situated in all respects relevant to the challenged government action."  *Id.* (quoting *Gianfrancesco v. Town of Wrentham*, 712 F.3d 634, 640 (1st Cir. 2013)).

Plaintiffs point to a Hampton Inn approved in 2016 as a similarly situated comparator. There are some similarities between the projects.  Heilbronner's firm designed that hotel. (Dkt.

No. 74-2 at 12.)  The Planning Staff submitted similar findings regarding the impact on social services.  (Dkt. No. 74-1 at 22.)  And, as here, Unite Here opposed the hotel project, arguing that the proposal failed to comply with OPC § 17.103.05(A)(2).  (*Id.* at 74–81.)

But, drawing all reasonable inferences in Plaintiffs' favor, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), the Hampton Inn project differed from Plaintiffs' project in two material and undisputed respects.  First, the Hampton Inn did not request a setback variance.  And second, the procedural posture of the Hampton Inn project differed from that here.  There, a "Zoning Manger" approved the initial design, Unite Here appealed to the Planning Commission, and the Planning Commission affirmed the Zoning Manager.  (Dkt. No. 74-1 at 16.)  Thus, unlike in Plaintiffs' case, the Hampton Inn permit was never before the City Council.

Based on the record provided, Plaintiffs' "class-of-one" claim fails as a matter of law because Plaintiffs cannot establish that it is similarly situated to the proposed comparator in all material respects."  *SmileDirectClub*, 31 F.4th at 1123. *Purze v. Village of Winthrop Harbor* is instructive here. 286 F.3d 452 (7th Cir. 2002).  In *Purze*, the Seventh Circuit held permit applicants were dissimilar when the applicants requested "different variances" and had their plats granted by "different and previous Boards." *Id.*  As in *Purze*, the variance requests here differed and, critically, *different* decision-making bodies controlled the two decisions here.  In other words, the City Council could not have treated Plaintiffs differently from the Hampton Inn project because the City Council never considered the Hampton Inn project.

Thus, Plaintiffs fail to establish a comparator "similarly situated in all respects relevant to the challenged government action." *Gianfrancesco*, 712 F.3d at 640.  Because Plaintiffs fail to establish an element vital to their claim, the "class-of-one" equal protection claim fails.  The Court grants Defendant's motion for summary judgment on the "class-of-one" equal protection claim.

### 2.    Municipal Liability

A local governmental unit may not be held responsible for the acts of its employees under a respondeat superior theory of liability. *See Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997).  "To [prevail on a claim against a municipal entity for a constitutional violation], a plaintiff must go beyond the respondeat superior theory of liability and demonstrate that the

20

1    alleged constitutional deprivation was the product of a policy or custom of the local governmental

2    unit." *Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784, 793 (9th Cir. 2016) (en banc).

3           To prove Defendant had an official policy that violated the Equal Protection Clause,

4    Plaintiffs argue that "there is abundant evidence from witnesses Jim Heilbronner, Tulsee Nathu,

5    Mike Rivera, and the City Council members cited above that the City Council's denial of

6    Plaintiffs' permit because [sic] the Plaintiffs refused to hire or sign a card check neutrality

7    agreement with the 2850 Union was the Official Policy of the City of Oakland[.]"  (Dkt. No. 74 at

8    27.)  Plaintiffs' brief provides no further argument on the point.

9           Plaintiffs' separate *Monell* "equal protection" claim fails because Plaintiffs misapprehend

10   the nature of *Monell*.  *Monell v. Department of Social Services* 436 U.S. 658 (1978) established

11   that municipalities can be held liable for constitutional violations if a municipal policy or custom

12   caused a plaintiff's constitutional deprivation.  But *Monell* does not create liability for the mere

13   existence of a policy.  Rather, *Monell* and its progeny describe the situations under which a

14   municipality could be held responsible for constitutional violations because there is no respondeat

15   superior liability under 28 U.S.C. § 1983.  Plaintiffs' opposition attempts to identify a municipal

16   policy, but never explains *why* such a policy is a violation *of the Equal Protection Clause*. In other

17   words, an underlying constitutional violation is a prerequisite to liability under *Monell*.  As the

18   Court has already rejected Plaintiffs' "class-of-one" argument, Plaintiffs' separate *Monell* Equal

19   Protection Clause claim must also fail because Plaintiffs do not explain any alternative theory of

20   constitutional liability under the Equal Protection Clause.  Thus, the Court enters summary

21   judgment on the *Monell* claim in favor of Defendant.

22          **B.     The Takings Clause**

23          Plaintiffs next bring a claim under the Fifth Amendment's Takings Clause.  Plaintiffs

24   argue that the City of Oakland violated the Fifth Amendment because the City Council ordered

25   Plaintiffs to enter into an agreement with a union as a condition of the permitting process. (Dkt.

26   No. 74 at 27-28.)

27          The government may condition the use of one's property on agreeing to an exaction, or the

28   dedication of one's other property to the public use, "so long as there is a 'nexus' and 'rough

21

proportionality' between the property that the government demands and the social costs of the applicant's proposal." *Koontz v. St. Johns River Water Mgmt. Dist.,* 570 U.S. 595, 605–606 (2013) (quoting *Dolan v. City of Tigard*, 512 U.S. 374, 391 (1994), and *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 837 (1987)). In evaluating the constitutionality of an exaction, the Court must balance (1) the vulnerability of "land-use permit applicants" who can be strongarmed by government entities with "broad discretion" with (2) legitimate government interests in "landowners internaliz[ing] the negative externalities of their conduct." *Ballinger v. City of Oakland*, 24 F.4th 1287, 1298 (9th Cir.), *cert. denied sub nom. Ballinger v. City of Oakland, California*, 142 S. Ct. 2777 (2022) (quoting *Koontz*, 570 U.S. at 604–05).

The first step in this analysis is defining the exact unconstitutional condition at issue. In *Nollan*, for example, the California Coastal Commission conditioned permit approval on the owner's agreement to grant a public beach access easement across the owner's land. In *Dolan*, the city conditioned a permit to expand retail business operations upon the owner's agreement to give a strip of property to the city for use as a bike path and flood-control greenway. And in *Koontz*, the Court found that *Nollan* and *Dolan* apply even when a city demands money as the exaction, denies a permit, and no money changes hands. *Koontz*, 570 U.S. at 619. In their brief, Plaintiffs describe the taking as a requirement to hire Unite Here to operate the Mandela Hotel. (Dkt. No. 74 at 29.) Plaintiffs state: "[t]here is no question that the City of Oakland has no authority to order a private hotel developer, building a hotel on the developers own land, to hire a union or enter into a contract with a 2850 Union to operate the hotelier's hotel. Thus, the Plaintiffs' takings claim is valid." (*Id.*)

Plaintiffs' theory that the City unlawfully ordered them to hire a union fails because no reasonable trier of fact could find that the City ever imposed such a condition. To the contrary, Tulsee Nathu testified: "[councilmembers] wanted us to enter a card check neutrality agreement with [Unite Here]," "it would be just to get into a card check neutrality agreement," and "I do not recall them saying to hire 2850." (Dkt. No. 74-3 at 10.) Similarly, Heilbronner affirmed that no city councilmember conditioned approval based on entering a collective bargaining agreement with Unite Here, but he believed a "commitment to the unions" either through "a neutrality

1    agreement or an out-and-out agreement" would have satisfied the City Council.  (Dkt. No. 74-2 at

2    10, 17.)

3           Plaintiffs' briefing on the takings claim does not identify the evidence in the record that

4    supports a finding of such a condition.  *See Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996)

5    (holding that it is not the district court's task to scour the record, and instead the courts may rely

6    on the non-moving party to identify the record evidence that creates a disputed fact).  At oral

7    argument, Plaintiffs insisted that the councilmembers' statements at public hearings constitute a

8    condition.  But Plaintiffs fail to identify more than two councilmembers that voted against the

9    proposal and made statements at the hearings supporting an inference that union hiring was a

10   condition of approval.  (*See* Dkt. No. 74 at 8.)  Plaintiffs do not explain how such statements can

11   support a finding of an exaction when, excluding those two councilmembers, a majority of the

12   Council *still* opposed the project.  Given Plaintiffs' witnesses own testimony, and Plaintiffs'

13   failure to identify any evidence that disputes Plaintiffs' testimony by supporting an inference that

14   the City Council conditioned permit approval on contracting with Unite Here, no genuine dispute

15   of material fact exists. Drawing all reasonable inferences from the evidence in Plaintiffs' favor, no

16   reasonable trier of fact could find that the City "ordered" Plaintiffs to hire Unite Here to operate

17   the hotel.

18          A header in Plaintiffs' opposition brief suggests they are also asserting that the City

19   unlawfully conditioned the permit approval on Plaintiffs entering into a card-check neutrality

20   agreement.  (Dkt. No. 74 at 27.)  But a card-check neutrality agreement is mentioned only in the

21   header and nowhere else in Plaintiffs' takings argument.  Indeed, Plaintiffs' takings argument

22   relies solely on the claim that the City ordered Plaintiffs to hire Unite Here.  (*Id.*)  Thus, Plaintiffs

23   do not identify any evidence that could support a finding that the City conditioned permit approval

24   on entering a card-check neutrality agreement.  For this reason alone, their card-check neutrality

25   agreement takings theory fails.  *Cf. Velie v. Hill*, 736 F. App'x 165, 166 (9th Cir. 2018) (holding,

26   in an unpublished case, that a heading without further citing authority waives an argument); *see*

27   *also*  Fed. R. Civ. P. 56(c)(1)(A), (B) ("A party asserting that a fact cannot be or is genuinely

28   disputed must support the assertion by . . . citing to particular parts of materials in the record");

1   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (a court must grant summary judgment if a

2   party "fails to make a showing sufficient to establish the existence of an element essential to that

3   party's case, and on which that party will bear the burden of proof at trial"); *Keenan*, 91 F.3d at

4   1279 (a district court need not "scour" the record).

5          At oral argument, Plaintiffs identified some evidence that the City encouraged a "card-

6   check neutrality agreement." (Dkt. No. 69-2 at 25; Dkt. No. 74-3 at 11.)  But, assuming a

7   reasonable trier of fact could find the City asked Plaintiffs to sign some form of agreement, the

8   claim still fails on this record.  An exaction is legal "so long as there is a 'nexus' and 'rough

9   proportionality' between the property that the government demands and the social costs of the

10  applicant's proposal."  *Koontz*, 570 U.S. at 605–606.  As Plaintiffs do not discuss the card-check

11  agreement in their brief, it follows that they do not define a card-check agreement or explain how

12  any particular provision constitutes an exaction.  Indeed, at oral argument the Court asked

13  Plaintiffs to define a card-check agreement and Plaintiffs failed to explain the agreement or

14  highlight any offensive terms within the agreement.  Plaintiffs have therefore not met their burden

15  of establishing a genuine dispute as to whether the card-check agreement, whatever it was,

16  constitutes an exaction.

17         After the City's summary judgment motion was argued and submitted, Plaintiffs filed a

18  supplemental submission pointing to the location in the record where a card-check agreement is

19  located.  (Dkt. No. 84 at 2 (citing Dkt. No. 69-1 at 65-70).)  But, again, Plaintiffs do not explain

20  how it could constitute an unlawful exaction.  Thus, because Plaintiffs fail to provide any

21  explanation as to how a card-check agreement constitutes a taking, the Court must grant summary

22  judgment in favor of Defendant on the Fifth Amendment claim.

23         **C.     Due Process Clause Challenge**

24         Planning Code § 17.103.05(A)(2) requires any permit proposal for a hotel "consider[] the

25  impact of the employees of the hotel or motel on the demand in the City for housing, public

26  transit, and social services."  OPC § 17.103.050(A)(2).  Plaintiffs' final claim alleges Planning

27  Code § 17.103.05(A)(2) violates the Due Process Clause because it is impermissibly vague.

28         Government regulation must be sufficiently clear so that ordinary people can understand

United States District Court
Northern District of California

24

1   what conduct is prohibited, *Grayned v. City of Rockford,* 408 U.S. 104, 108 (1972), and so that the

2   regulation "does not encourage arbitrary and discriminatory enforcement." *Kolender v.*

3   *Lawson,* 461 U.S. 352, 357 (1983).  Economic regulation is subject to the vagueness test, but that

4   test is "less strict" than the test applied to criminal laws. *Vill. of Hoffman Ests. v. Flipside,*

5   *Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982); *see also Kolender v. Lawson*, 461 U.S. 352, 358

6   n.8 (1983) (discussing applications of vagueness doctrine in criminal law).  In reviewing a

7   statute's language for vagueness, "we are relegated . . . to the words of the ordinance itself, to the

8   interpretations the . . . given to analogous statutes, and perhaps to some degree, to the

9   interpretation of the statute given by those charged with enforcing it." *Grayned,* 408 U.S. at

10  110 (cleaned up).  Plaintiffs argue Planning Code § 17.103.05(A)(2) violates the vagueness test—

11  both as applied to Plaintiffs' particular circumstances and facially.

### 1.   As Applied

13  Plaintiffs as applied vagueness challenge to Planning Code § 17.103.05(A)(2) is moot

14  because the Court concluded that substantial evidence supported the decision to deny the building

15  permit due to the setback variance issue.  *See Dittman v. California,* 191 F.3d 1020, 1025 (9th

16  Cir.1999) (holding courts have an independent obligation to address sua sponte whether a case is

17  moot).  Because the Court upheld the permit denial on grounds independent from Planning Code

18  § 17.103.05(A)(2), Plaintiffs lack a legally cognizable interest in the outcome of an as applied

19  challenge to § 17.103.05(A)(2). *Clark v. City of Lakewood*, 259 F.3d 996, 1011 (9th Cir. 2001), *as*

20  *amended* (Aug. 15, 2001).  Put differently, Plaintiffs cannot claim the City Council's interpretation

21  of Planning Code § 17.103.05(A)(2) injured them because—given the variance issue—Defendant

22  would have denied the permit in any event. *Id.* at 1011 n.7 ("The phrases 'legally cognizable

23  interest' and 'injury in fact' are for all practical purposes synonymous.")  Thus, the Court grants

24  summary judgment in favor of Defendant on the as applied challenge to Planning Code §

25  17.103.05(A)(2) because the question is moot.

### 2.   Facial Challenge

27  Plaintiffs have standing to facially challenge Planning Code § 17.103.05(A)(2) because

28  Plaintiffs still wish to build a hotel in Oakland, retain the option to purchase the property, and can

United States District Court
Northern District of California

1    reapply for a building permit.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563 (1992).  A party

2    challenging the facial validity of an ordinance on vagueness grounds outside the domain of the

3    First Amendment must demonstrate that "the enactment is impermissibly vague in all of its

4    applications."  *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 972 (9th Cir.

5    2003) (quoting *Hoffman*, 455 U.S. at 495).  This test provides "a hurdle that is difficult . . . to

6    scale." *Id.*

7             Plaintiffs have not demonstrated that Planning Code § 17.103.05(A)(2) is vague in every

8    application.  The critical term is "consider." Section 17.103.05(A)(2) requires that proposals

9    "consider" the impact of hotel employees on housing, public transit, and social services.  Citing to

10   depositions, Plaintiffs argue Planning Staff had no training or standards regarding

11   § 17.103.05(A)(2) and that the City Council has unlimited discretion to apply the law arbitrarily.

12   (Dkt. No. 74 at 24–25.)   But Plaintiffs also recognize that "consider" means "to think over

13   carefully, ponder, reflect." (*Id.* at 26.)  The Oxford English Dictionary likewise defines "to

14   consider" as "to view or contemplate attentively," "to survey, examine, inspect, scrutinize," and

15   "to look attentively." *Consider*, *Oxford English Dictionary* (online)

16   (www.oed.com/view/Entry/39593) (last visited Oct. 10, 2022).  A person of ordinary intelligence

17   would understand that to build a hotel in Oakland under Planning Code § 17.103.05(A)(2), the

18   applicant must estimate how many potential employees will use public transit, housing, and social

19   services in Oakland.  As discussed above, the government may condition the use of one's property

20   on agreement to an exaction, or the dedication of one's other property to the public use, "so long

21   as there is a 'nexus' and 'rough proportionality' between the property that the government

22   demands and the social costs of the applicant's proposal." *Koontz,* 570 U.S. 605–606.  Absent an

23   analysis of such social costs, the government would be unable to calculate a constitutionally

24   permissible exaction.  Section § 17.103.05(A)(2) merely places the burden on applicants to

25   calculate those social costs.  A permit application that did not include any such analysis would

26   fail.  As would an application that analyzed only impacts on public transit and housing, but not

27   social services—or any combination thereof.

28             Thus, because some applications could provide adequate guidance, the scheme is not

United States District Court
Northern District of California

impermissibly vague as to every application.  Because the statute is not impermissibly vague in every application, the Court enters summary judgment in favor of Defendant.  *Hotel & Motel Ass'n of Oakland*, 344 F.3d at 972.

**III.    Declaratory Relief**

Defendant moved for summary judgment on Plaintiffs declaratory relief causes of action (Counts IV and V) as duplicative of Plaintiffs' other requests for relief.  Plaintiffs did not oppose.  Thus, the Court GRANTS summary judgment on Counts IV and V.

**CONCLUSION**

For the reasons stated above, the Court DENIES the petition for a writ of mandate under CCP § 1094.5 and GRANTS Defendant's motion for summary judgment on Plaintiffs' remaining claims.

This Order disposes of Dkt. Nos. 67, 73

**IT IS SO ORDERED.**

Dated: December 14, 2022

JACQUELINE SCOTT CORLEY
United States District Judge